**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**TIMOTHY M. JOHNSTON,**

       **Petitioner,**

  **v.**                                                    **9:01-CV-1770**
                                                        **(NAM) (GJD)**

**DANIEL SENKOWSKI, Superintendent,**

       **Respondent.**
:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**APPEARANCES:**                         **OF COUNSEL:**

**FOR THE PETITIONER:**

**BIANCO LAW OFFICES**            **RANDI JUDA BIANCO, Esq.**
The Hogan Building, Suite 202
247 West Fayette Street
Syracuse, NY 13202

**FOR THE RESPONDENT:**

**HON. ELIOT SPITZER**            **SENTA B. SIUDA, Esq.**
Office of the Attorney General    Assistant Attorney Gen'l
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204-2455

**GUSTAVE J. DIBIANCO, MAGISTRATE JUDGE**

<u>**REPORT-RECOMMENDATION**</u>

**I.**   <u>**Background**</u>

    **A.**   <u>**State Court Proceedings**</u>

According to the testimony adduced at trial, on Friday, December 20,

1996, S.T.,[1] a five year old girl, attended the Chenango Nursery School in Hamilton, New York ("Nursery").  *See* Transcript of Trial of Timothy M. Johnston (5/5/97) ("Trial Tr.") at pp. 937-38, 1264.  S.T.'s teacher at the time was Connie Ioset, and the teacher's aide in S.T.'s classroom was petitioner Timothy Johnston, whom S.T. referred to as "Mr. Tim."  Trial Tr. at p. 945. On the afternoon of December 20, 1996, S.T. went to the three year old classroom to take a nap along with other children.  Trial Tr. at pp. 1291-93, 1372.  On that day Johnston was assigned to work in that classroom during nap time.  Trial Tr. at pp. 1291-93, 1372.  As S.T. was lying down, Johnston began rubbing her back.  Trial Tr. at p. 1225.  Sometime thereafter, Johnston moved to an area near a door, and began building toy airplanes out of popsicle sticks.  Trial Tr. at pp. 1225, 1298.  He motioned for S.T., who was still awake, to come over to see him.  Trial Tr. at pp. 1616-17.  She then sat on his lap, and Johnston proceeded to put his hand under her

---

[1]     Under New York law:

> [t]he identity of any victim of a sex offense ... shall be confidential.  No ... court file or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection.

New York's Civil Rights Law  § 50-b.  In light of this provision, this Court will refer to the victim by the initials of her name.

clothing and placed his finger in her "bottom," Trial Tr. at pp. 1616-17, the

term S.T. used when she referred to "female private parts."  Trial Tr. at p.

941.[2]

S.T.'s mother, Nita, picked up S.T. at approximately 3:30 p.m. that

day.  Trial Tr. at p. 959.  Nita asked S.T. to go to the bathroom before they

left the house, however she refused.  Trial Tr. at pp. 949-53.[3]  Nita persisted

in her request, however, and, after requesting for the fourth time that S.T.

use the bathroom, S.T. complied, sat on the toilet, and began crying.  Trial

Tr. at p. 989.  Nita went into the bathroom and discovered blood in the

crotch of S.T.'s underwear.  Trial Tr. at p. 953.  Nita then took the

underwear, placed it in a plastic bag, and brought S.T. to the emergency

room of a nearby hospital.  Trial Tr. at pp. 954-55.[4]

Barbara Condro, a physicians' assistant at the hospital, examined S.T.

and noticed redness and two tears around S.T.'s vaginal opening.  Trial Tr.

---

[2]      S.T. testified that "[i]t hurt" when Johnston placed his finger in her
bottom.  Trial Tr. at p. 1617.

[3]      Nita testified that it was common for S.T. to avoid going to the
bathroom.  Trial Tr. at p. 992.

[4]      The blood in S.T.'s clothing was subsequently tested and determined
to be S.T.'s blood.  *See* Record on Appeal ("Record") at p. 2206.

at p. 1446.[5]  Dr. John C. Bowen, the on-call gynecologist on that day, also examined S.T. and observed "abrasions and irritation of the vulva region of the inner labia."  Trial Tr. at pp. 1677-80.  Dr. Bowen also noticed a small break in the skin near S.T.'s vaginal opening, as well as a small amount of fresh blood near that area.  Trial Tr. at pp. 1680-81.  Dr. Bowen testified that S.T.'s injuries had occurred within hours of his examination, and that sexual abuse was "very high" on his list of what caused her injuries.  Trial Tr. at p. 1686.  Additionally, Dr. Bowen's examination did not reveal any contusions or injury to S.T.'s outer genitalia, which would likely have been present if S.T.'s injury had been caused by a fall or a straddle injury.  Trial Tr. at p. 1687.

Since S.T. had expressed difficulty in urinating, Dr. Bowen sought to determine whether she was suffering from an infection, including a urinary tract infection.  Trial Tr. at p. 1686.  Therefore, Dr. Bowen requested that a urinalysis be conducted of S.T.'s urine, and that a urine culture and cultures from S.T.'s vagina be examined.  Trial Tr. at p. 1687.  The results of those tests established that S.T. was not suffering from any urinary tract infection

---

[5]        Condro had only seen conditions similar to that belonging to S.T. in situations where abuse had occurred.  Trial Tr. at p. 1448.  Condo further testified that S.T.'s symptoms were not indicative of urinary tract infections.  Trial Tr. at p. 1449.

at the time.  Trial Tr. at pp. 1687, 1695-97.

On the evening of December 20, 1996, a caseworker for the Madison County Department of Social Services received a telephone call regarding allegations of sexual abuse at the Nursery.  Trial Tr. at pp. 1133-34.  The caseworker contacted the New York State Police, and an investigation into the claim commenced.  Trial Tr. at pp. 1134-35.  Investigator David Longo of the New York State Police was assigned to assist in that investigation, and on December 21, 1996 he questioned S.T. and her mother as to what had occurred on December 20, 1996.  Trial Tr. at pp. 1136-37, 1187-88.[6] Following that interview, Detective Longo spoke with both Ioset and Denise Dinski of the Nursery, after which Detective Longo attempted to contact Johnston.  Trial Tr. at pp. 1190-91.  At approximately 7:45 p.m. on December 21, 1996, Detective Longo located Johnston, who agreed to accompany Detective Longo to the Morrisville Police Station for questioning. Trial Tr. at pp. 1193, 1213-14.  Once Johnston was in Detective Longo's vehicle, he was read his *Miranda* rights.[7]  Trial Tr. at pp. 1215-16.  Upon arriving at the station, Johnston was again advised of his *Miranda* rights,

---

[6]     At the time she was questioned, S.T. was sitting on her mother's lap. Trial Tr. at p. 1189.

[7]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

Trial Tr. at pp. 1219-20, after which Johnston admitted that on December 20, 1996, he rubbed S.T.'s back during naptime at the Nursery and thereafter picked her up and placed her on his lap.  Trial Tr. at p. 1225. When advised by Detective Longo that S.T. had been injured and that she had informed him that Johnston had caused her injury, Johnston admitted that on December 20, 1996, he had "picked [S.T.] up with his ... right hand under her bottom, put her on his lap ... and as he pulled his hand out from front to back, he kept his fingers curled," thereby possibly causing S.T.'s injury.  Trial Tr. at p. 1226.  Johnston was thereafter placed under arrest, Trial Tr. at p. 1231, and subsequently indicted by a Madison County grand jury and charged with aggravated sexual abuse in the second degree, first degree sexual abuse, and sexual conduct against a child in the second degree.  *See* Indictment No. 97-0016 ("Indictment") (Record at pp. 006a-008a).[8]

Beginning on May 5, 1997, Johnston was tried on the above charges before a jury with Madison County Court Judge Michael V. Coccoma presiding.  Record at p. 186a.  After the jury had been selected, the prosecution moved to preclude Johnston's counsel from calling Dr. Michael

---

[8]     That indictment also charged Johnston with sexually abusing another child at the Nursery.  *See* Indictment at Counts Four, Five.

Toglia as an expert witness for the defense.  Trial Tr. at pp. 882-83.  In the

offer of proof previously filed with the court concerning that proposed

witness, Johnston's counsel indicated that Dr. Toglia would likely testify,

*inter alia*, that:  i) studies had established that people who interview children

often do so in suggestive ways; ii) young children can be more easily "led

astray by suggestive interviews;" and iii) based upon his review of the file

relating to S.T., Dr. Toglia believed that suggestive elements were present

during the course of the interviews conducted of S.T. that may have

impacted the reliability of the information obtained during those interviews.

*See* Record at pp. 2229-30.  In granting the prosecution's motion to

preclude Dr. Toglia's testimony, Judge Coccoma noted that he had:

> paid particular attention during voir dire of
> prospective trial jurors ... on the issue of
> suggestibility in regards to the interviewing of
> children and whether or not children tell the truth,
> [and] whether or not children lie.... [S]pecifically,
> prospective jurors were asked their opinions
> regarding children testifying.

Trial Tr. at p. 885.  Based upon that voir dire, Judge Coccoma concluded

that the factors that could influence a child's statements were within the

"common knowledge and experience" of the jurors, and that therefore the

jury did "not need the benefit of Mr. Toglia's testimony to aid them in

drawing the conclusion on the issue of credibility."  Trial Tr. at pp. 885-86.

Judge Coccoma also found that the defense had failed to demonstrate that

Dr. Toglia's opinions were generally accepted in the field of psychology.

Trial Tr. at pp. 886-87.

During the course of the prosecution's case-in-chief, Judge Coccoma

conducted a hearing pursuant to New York Criminal Procedure Law ("CPL")

§ 60.20 to determine whether S.T. was competent to testify at Johnston's

trial.[9]  Trial Tr. at p. 1585.  Following that hearing, Judge Coccoma

determined that S.T. possessed "sufficient intelligence and maturity to justify

the reception of her testimony, and ... appreciate[d] the obligations of taking

an oath and the consequences of not testifying truthfully."  Trial Tr. at p.

1607.  Therefore, over defense counsel's objection, Judge Coccoma

allowed S.T. to provide sworn testimony at Johnston's trial.  Trial Tr. at p.

1608.  S.T. thereafter testified that on a day she was in "Sandy's room" at

the Nursery,[10] she was sitting on "Mr. Tim's" lap when he put his finger in

---

[9]      A hearing pursuant to CPL § 60.20 is utilized to ascertain whether a
witness who is less than nine years old may properly give sworn testimony at a trial.
*See* CPL § 60.20(2); *People v. Munroe*, 307 A.D.2d 588, 589 (3d Dept.), *leave
denied*, 100 N.Y.2d 644 (2003).

[10]      Sandra Crumb was the preschool teacher regularly assigned to the
three year old room at the Nursery.  Trial Tr. at pp. 1415-16.

her "bottom," hurting her.  Trial Tr. at pp. 1614-16.[11]  S.T. further testified that Johnston had placed his finger(s) in her bottom on at least one other occasion.  Trial Tr. at pp. 1619-20.  S.T. was not, however, able to identify Johnston in the courtroom at the time of her testimony.  Trial Tr. at p. 1648.

At the conclusion of his trial, the jury found Johnston guilty of second degree aggravated sexual abuse and first degree sexual abuse with respect to S.T., but not guilty of the charge alleging a course of sexual conduct against a child.  Trial Tr. at pp. 2131-32.  Johnston was also acquitted of the fourth and fifth counts in the indictment, which charged Johnston with sexually abusing another child at the Nursery.  Trial Tr. at p. 2132.

On July 11, 1997, Johnston appeared before Judge Coccoma for sentencing.  At the beginning of that proceeding, the prosecution noted its objection to thirty-four letters that were sent to Judge Coccoma as character references for Johnston.  Record at p. 2250.  Judge Coccoma noted that "the social history on Mr. Johnston, his family, background, [and] standing in the community was accurately portrayed in the probation report."  Record at pp. 2250-51.  Judge Coccoma then stated that he had not read any of the

---

[11]    S.T. also identified on a photograph of that room in the Nursery the location at which the incident involving Johnston had occurred.  Trial Tr. at pp. 1625-26.

letters because they were unsolicited, and that he would not read those letters before pronouncing sentence because the letters were "*ex parte* communications which were attempting to influence my judgment in this case." Record at p. 2251.[12]  Judge Coccoma thereafter sentenced Johnston to a term of seven to fourteen years imprisonment on the second degree aggravated sexual abuse conviction, and a concurrent term of three to six years imprisonment on the first degree sexual abuse conviction.  Record at pp. 2322-23.

Johnston appealed his convictions and sentences to the New York State Supreme Court Appellate Division, Third Department.  That court affirmed, *see People v. Johnston*, 273 A.D.2d 514 (3d Dept. 2000), and the New York Court of Appeals denied Johnston's application for leave to appeal.  *People v. Johnston*, 95 N.Y.2d 935 (2000).  Johnston's only state-court challenge to his conviction was his direct appeal.  *See* Petition at ¶ 10.

### B.   Proceedings in this Action

With the assistance of counsel, Johnston filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254 in this District on November 20, 2001.

---

[12]     Judge Coccoma explained that the letters had been sent by "individuals off the street writing me letters, attempting to influence my judgment in the case."  Record at p. 2252.

Petition at p. 1.  In his petition, Johnston claims that:  i) he was denied the effective assistance of trial counsel; ii) the evidence adduced at trial was legally insufficient to establish his guilt as to either of the two convictions; iii) Judge Coccoma wrongfully deprived Johnston of his right to present a complete defense when the County Court precluded Johnston from calling Dr. Toglia as an expert witness; and iv) Johnston was denied due process at his sentencing because Judge Coccoma refused to consider any of the thirty-four letters submitted to the court on Johnston's behalf.  *See* docket no. 1 at pp. 10-14; docket no. 10 at pp. 6-33.  This Court ordered a response to Johnston's petition.  Docket no. 3.  The Office of the Attorney General for the State of New York ("Attorney General"), acting on respondent's behalf, filed an answer and memorandum of law requesting dismissal of the petition.  *See* docket nos. 12-13.  In opposing Johnston's petition, respondent argues that petitioner has not exhausted one of the theories asserted in his first ground for relief, and that all of the claims raised in the petition are without merit.  Docket no. 13 at pp. 7-19.  Johnston then filed reply brief in further support of his application.  *See* docket no. 15.

## II.    Discussion

### A.    Exhaustion Requirement

It is well settled that all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254(b)(1)(A); *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971) and *Daye v. Attorney General of New York*, 696 F.2d 186, 190 (2d Cir. 1982) (en banc)) (other citation omitted); *see also Glover v. Bennett*, 1998 WL 278272, at *1 (N.D.N.Y. May 21, 1998) (Pooler, D.J.). The exhaustion requirement is "grounded in principles of federal-state comity and 'respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions.'" *Smalls v. Batista*, 191 F.3d 272, 277 (2d Cir. 1999) (quoting *Daye*, 696 F.2d at 191). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Daye*, 696 F.2d at 191. "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Glover*, 1998 WL 278272, at *1 (quoting *Daye*, 696 F.2d at 192) (footnote omitted); *see also Shaut v. Bennet*, 289 F.Supp.2d 354, 359 (W.D.N.Y. 2003) (quoting *Daye*).

12

The Court's review of the documents submitted in support of petitioner's application for habeas relief in conjunction with the state court record below supports respondent's argument that petitioner did not exhaust one of the theories he has asserted in support of his first ground for relief. Moreover, it is apparent that several other claims asserted by Johnston in his petition have not yet been presented by him to the state courts.

### B.    Unexhausted Claims

### 1.    Ground One

In his first ground, petitioner argues that medical testimony was "the linchpin of the prosecution's case," and that the critical distinction between the allegations against Johnston regarding S.T. and the charges asserted against him relating to the other alleged victim of abuse of which he was acquitted was medical testimony.  Docket no. 10 at p. 7.  Petitioner argues that in light of the medical evidence offered against Johnston, trial counsel was constitutionally required to call an expert witness in Johnston's defense. *Id.* at pp. 8-9.  Petitioner further contends that if Dr. Michael Jordan had been utilized by the defense, he would have testified that he could not have excluded the diagnosis that S.T. was suffering from a urinary tract infection at the time she was examined at the hospital on December 20, 1996.  *Id.* at

p. 9; *see also* Petition at Ex. A.  Petitioner further contends that counsel's failure to cross-examine prosecution witnesses concerning "then existing published studies which countered their opinions" relating to the cause of S.T.'s injuries further establishes that petitioner received ineffective assistance.  *Id.* at pp. 9-11.  Petitioner argues that his trial counsel's failure to "offer ***any*** medical evidence or seek to confront the prosecution's experts with periodicals which would challenge their medical opinion" constituted ineffective assistance.  *Id*. at p. 12 (emphasis in original).  Petitioner then cites several different articles which he contends should have been utilized to discredit the testimony of the prosecution's medical witnesses, including an article written by one of the witnesses at Johnston's trial, Dr. Ann Botash.  *Id*. at pp. 12-15.  Johnston also appears to claim that the cumulative effect of counsel's errors deprived petitioner of the effective assistance of counsel.  *Id.* at pp. 18-19.

Johnston never claimed in his appeal that his trial attorney's performance was deficient because he failed to call Dr. Jordan as an expert witness.[13]  Nor does a fair reading of Johnston's appellate brief reveal any

---

[13]     In fact, the letter from Dr. Jordan in which he opines that S.T.'s injuries may have been attributable to a urinary tract infection was not written until November 15, 2001 – nearly one year ***after*** the Court of Appeals denied Johnston's application for leave to appeal.  *Compare* docket no. 1 at Ex. A *with* docket no. 12

claim that his trial attorney rendered ineffective assistance by failing to

adequately cross-examine the prosecution's medical witnesses, whether

through the use of articles relating to child psychology, abuse or neglect, or

any other means.  Although petitioner argues in his reply that his appellate

brief, construed broadly, could be viewed as alleging that trial counsel's

cross-examination of prosecution witnesses was deficient, *see* docket no.

15 at p. 3 (referencing Appellate Brief (1/26/00) ("App. Br.") at p. 51), the

Court notes that even a liberal reading of counsel's appellate brief (and reply

memorandum on appeal) fails to reveal any claim that could reasonably be

viewed as one challenging trial counsel's cross-examination of any

prosecution witness.  *See* App. Br.; Reply Brief in Support of Appeal.[14]

Since the exhaustion doctrine is only satisfied if a claim has been "fairly

presented" to the state courts, *see Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir.

1997) (quoting *Picard*, 404 U.S. at 275 ), this Court finds that neither

Johnston's appellate brief nor his reply memorandum fairly presented any

claim regarding trial counsel's cross-examination of prosecution witnesses

---

at Ex. 8.

[14]     New York's appellate courts do not have "'a duty to look for a needle
in a paper haystack'" in attempting to ascertain the claims that are presented for
appellate review. *Meatley v. Artuz*, 886 F.Supp. 1009, 1014 (E.D.N.Y. 1995) (citing
*Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)).

to the state courts.  Finally, neither Johnston's appellate brief nor his reply in support of his appeal argued that the cumulative effect of trial counsel's errors deprived Johnston of his right to a fair trial.[15]

### 2.   Ground Two

In his second ground, Johnston alleges that the proof adduced at trial was insufficient to establish petitioner's guilt as to either of the crimes of which he was convicted.  *See* Petition, Ground Two.

In one of the theories asserted in support of this claim, Johnston argues that the prosecution failed to establish that S.T. suffered any "physical injury" as a result of Johnston's conduct.  *Id.*  Specifically, petitioner notes that a conviction for aggravated sexual abuse in the second degree requires proof of "physical injury,"[16] which in turn is defined as an injury causing either the impairment of a physical condition or substantial pain.  *See* docket no. 10 (citing Penal Law § 10.00[9]); *see also People v. Carroll*, 300 A.D.2d 911, 913-14 (3d Dept. 2002), *leave denied*, 99 N.Y.2d

---

[15]     In his appellate brief, Johnston did assert a claim now raised in his first ground for habeas relief which faults trial counsel for failing to request a pretrial hearing to determine whether the interviews conducted of S.T. were unduly suggestive.  *See* App. Br. at pp. 53-54.

[16]     In New York, a person is guilty of aggravated sexual abuse in the second degree "when he inserts a finger in the vagina, urethra, penis, or rectum of another person causing physical injury to such person" when, *inter alia*, the other person is less than eleven years old.  N.Y. Penal L. § 130.67(1)(c).

626 (2003).

In his direct appeal, Johnston argued that there was insufficient evidence to convict him of the charge of aggravated sexual abuse in the second degree.  *See* App. Br. at pp. 39-50.  However, he never claimed in that appeal that the prosecution failed to establish that S.T. sustained any physical injury as a result of Johnston's conduct.  To the contrary, Johnston appears to have **conceded** in his appellate brief that S.T. had sustained physical injury, and chose instead to claim on appeal that Johnston was not the cause of those injuries.  *See* App. Br. at pp. 46 (arguing that the "intense physical examinations" to which S.T. was subject while at the hospital "were the cause of the injuries"); 47 (contending that "the injuries sustained [by S.T.] could have been caused by [S.T.] scratching herself"); and 47-48 (noting that "genital redness, scratches, rashes and urinary tract infections ... are consistent with sweat, tight pants, soap irritation, and the child's own actions") (citations omitted).

A claim has been "fairly presented" for purposes of exhaustion if the state courts are apprised of "***both*** the factual and the legal premises of the claim [the petitioner] asserts in federal court."  *Daye*, 696 F.2d at 191 (emphasis added); *see also Morales v. Miller*, 41 F.Supp.2d 364, 374

17

(E.D.N.Y. 1999).  Since Johnston never claimed in his appeal that the

evidence adduced at trial was insufficient to establish that S.T. had

sustained any "physical injury" as a result of his alleged conduct, this

argument in support of his second ground for relief (*see* docket no. 10 at p.

22) is unexhausted.[17]

### 3.   <u>Ground Three</u>

In his third ground, petitioner contends that his due process right to

present a complete defense to the charges against him was violated when

Judge Coccoma wrongfully precluded Dr. Toglia from testifying on behalf of

the defense.  *See* Petition at Ground Three.  In his supporting

memorandum, petitioner argues that Judge Coccoma erred when he

concluded, *inter alia*, that the opinions about which Dr. Toglia was to testify

were not generally accepted in the field of psychology.  *See* docket no. 10 at

pp. 26-30.

In his direct appeal, Johnston cited two articles in support of this

claim:  i) Ceci, S.J. & Bruck, M., *Jeopardy in the Courtroom* (American

Psychological Ass'n (1995)); and ii) Warren, Amye R. & McGough, Lucy S.,

_____

[17]     Petitioner did assert on appeal the other claim raised in his second
ground for relief, i.e., that S.T.'s failure to identify Johnston at trial requires reversal
of the convictions.  *See* App. Br. at p. 49.

18

*"Research on Children's Suggestibility  – Implications for the Investigative Interview*" (Criminal Justice and Behavior (1996)).  *See* App. Br. at p. 34.  In the supporting memorandum submitted in conjunction with his federal petition, Johnston cites three ***different*** articles in support of his federal claim that, at the time of Johnston's trial, Dr. Toglia's opinions were generally accepted in the field of psychology:  i) Anderson, D.D., "*Assessing the Reliability of Child Testimony in Sexual Abuse Cases*" 69 Southern California Law Review 2117 (Sept. 1996); Askowitz, L.R. & Graham, Michael H., *The Reliability of Expert Psychological Testimony in Child Sexual Abuse Prosecutions*" 15 Cardozo Law Review 2027 (Apr. 1994); and iii) Bernet, W., *Case Study: Allegations of Abuse Created in a Single Interview*" 36.7 Journal of the American Academy of Child Adolescent Psychology 966 (1997).  *See* docket no. 10 at p. 30.[18]

Thus, petitioner now relies upon materials that have never been presented to the state courts in support of this aspect of his third ground for relief.  Therefore, the factual portion of this aspect of his federal claim has

---

[18]        Petitioner also provides the names of four authors, "Bruck, M, Ceci, S.J., Francoeur, E., and Barr, R." in support of this aspect of his petition, however he did not provide the title of any article allegedly written by these authors, or the publication in which any such article was apparently published.  *See* docket no. 10 at p. 30.

not been presented to the state courts, see *Daye*, 696 F.2d at 191; *Morales*, 41 F.Supp.2d at 374, and is unexhausted.[19]  *E.g. Cowan v. Artuz*, 1996 WL 631726, at *3 (S.D.N.Y. Oct. 24, 1996) (habeas claim not exhausted where claim raised in state court "had different factual bases than significant portions" of claim asserted in the federal petition) (adopting Report-Recommendation of Magistrate Judge).[20]

## C.   <u>Recommended Stay of Action</u>

As the foregoing establishes, Johnston's petition presents both claims that have been presented to the state courts and others that have not.[21]

---

[19]     According to the dates of those articles as cited to this Court by petitioner, at least two of the articles referenced in Johnston's federal petition had been published prior to the date on which his criminal trial commenced.  *See* docket no. 10 at p. 30.

[20]     The other aspect of Johnston's third ground for relief, which argues that Judge Coccoma erred in finding that the proposed testimony of Dr. Toglia was within the common knowledge and experience of the jurors, was asserted on appeal.  *See* App. Br. at pp. 30-31.  Additionally, the claim in petitioner's fourth ground for relief, which challenges the County Court's failure to review the letters sent to that court prior to sentencing, was asserted on appeal.  *See* App. Br. at pp. 57-63.

[21]     To satisfy the exhaustion requirement, a habeas petitioner must have asserted all of the claims for which federal habeas review is sought when seeking leave to appeal to the New York Court of Appeals.  *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (describing process for seeking leave to appeal from the Court of Appeals); *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990) ("[u]ntil [petitioner] presents his claim to the highest state court – whether or not it seems likely that he will be held to be procedurally barred – he has not exhausted available state procedures"); *Bennett v. Artuz*, 285 F.Supp.2d 305, 311 (E.D.N.Y. 2003) (citing *Grey*, 933 F.2d 119).  This Court has not determined that the claims presented in Johnston's appellate brief have been ***fully*** exhausted by petitioner for

Prior to the enactment of the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"),

federal courts were required to dismiss "mixed petitions" containing both

exhausted and unexhausted claims.  *See Rose v. Lundy*, 455 U.S. 509, 510

(1982).  The AEDPA, however, now provides the federal district court with

discretion to deny, on the merits, habeas petitions containing unexhausted

claims.  28 U.S.C. § 2254(b)(2); *Orraca v. Walker*, 53 F.Supp.2d 605, 610

(S.D.N.Y. 1999).  That discretion has been exercised by district courts within

this circuit where the unexhausted claims are "patently frivolous."  *Wilson v.

Goord*, 2004 WL 226149, at *3 (S.D.N.Y. Feb. 6, 2004); *Pacheco v. Artuz*,

193 F.Supp.2d 756, 761 (S.D.N.Y. 2002) (citation omitted); *Orraca*, 53

F.Supp.2d at 611 (collecting cases).

     As noted above, petitioner's claim regarding trial counsel's failure to

call Dr. Jordan as an expert witness is based upon material that was

apparently obtained ***after*** Johnston was convicted on the charges contained

in the indictment.  *See* Petition at Ex. A.  Since a party may properly seek to

vacate his judgment of conviction under the CPL on the basis of newly

---

purposes of this action.

discovered evidence, *see* CPL § 440.10(1)(g),[22] it does not appear as

though this Court could properly deem this aspect of petitioner's

ineffectiveness claim exhausted.[23]   Moreover, County Courts are also

authorized to grant motions to vacate brought under CPL § 440.10 "in the

interest of justice and for good cause shown."[24]   *See* CPL § 440.10.   Thus, it

is possible that other claims that have been asserted by Johnston in his

federal petition which have not yet been presented to the state courts may

---

[22]   This section of the CPL provides:

1. At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that:

* * * * *

(g)   New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence ....

CPL § 440.10(1)(g).

[23]   When a claim has never been presented to the state courts, a federal court may "deem" such a claim exhausted "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile."   *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997)); *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000), *cert. denied*, 532 U.S. 943 (2001).

[24]   There is no time limit on when a party may file a motion to vacate a judgment of conviction pursuant to Section 440.10 of New York's Criminal Procedure Law ("CPL").   *See People v. Douglas*, 205 A.D.2d 280, 291 (1st Dept. 1994) (a party "'may move at *nisi prius* to vacate the judgment at any time'") (quoting *People v. Corso*, 40 N.Y.2d 578, 580 (1976), *aff'd*, 85 N.Y.2d 961 (1995)).

be considered by the County Court if petitioner were to file a motion to vacate pursuant to CPL § 440.10.

In *Zarvela v. Artuz*, 254 F.3d 374 (2d Cir. 2001), the Second Circuit provided guidance regarding the manner in which a federal court should proceed where a petitioner has presented unexhausted claims in a federal habeas petition which cannot be "deemed exhausted" for purposes of the federal habeas petition and are not subject to *sua sponte* dismissal as patently frivolous.  In *Zarvela*, the court stated that "[a]s to the exhausted claims, we think a district court should exercise discretion either to stay further proceedings on the remaining portion of the petition or to dismiss the petition in its entirety."  *Zarvela*, 254 F.3d at 380.  That court further held that because of the one year statute of limitations imposed on federal habeas petitions under the AEDPA, staying the federal action is the "only appropriate" course of action "where an outright dismissal 'could jeopardize the timeliness of a collateral attack.'"  *Id.* (quoting *Freeman v. Page*, 208 F.3d 572, 577 (7th Cir. 2000).

In this case, none of the arguments asserted in Johnston's federal habeas petition appear to be patently frivolous.  Additionally, one or more of these claims cannot be properly "deemed" exhausted for purposes of this

action.  Furthermore, it is clear that the dismissal of Johnston's petition

could well jeopardize the timeliness of any future habeas petition filed by

him regarding his convictions because the AEDPA's one year statute of

limitations is not tolled while a federal habeas petition is pending.  *Duncan v.*

*Walker*, 533 U.S. 167, 181-82 (2001); *Rodriguez v. Bennett*, 303 F.3d 435,

438 (2d Cir. 2002).[25]  This Court therefore recommends that this action be

stayed[26] to allow petitioner to file a motion to vacate his judgment of

---

[25]       Johnston's conviction became final on February 19, 2001.  *See*
*Johnston*, 95 N.Y.2d at 935 (denying application for leave to appeal on November
21, 2000); *Williams*, 237 F.3d at 150-151 (a judgment of conviction becomes final
under the AEDPA at the conclusion of the ninety day period during which the
defendant could have sought *certiorari* review in the United States Supreme Court).

[26]       This court is aware that the Supreme Court has recently decided a
case involving the Ninth Circuit's "stay and abeyance" procedure with respect to
mixed habeas corpus petitions. *Pliler v. Ford*, No. 03-221, 2004 U.S. LEXIS 4384,
72 U.S.L.W. 4523 (U.S. June 21, 2004).  In *Pliler*, the Court held that in utilizing its
"stay and abeyance" procedure, the district court was not required to warn the
petitioner of the consequences of dismissing the mixed petition, nor was the court
required to inform petitioner of his options regarding the mixed petition.  The
Supreme Court specifically did **not comment** on the propriety of the "stay and
abeyance" procedure, although it noted more than once that district courts must
dismiss mixed petitions under *Rose v. Lundy*, 455 U.S. 509 (1982).
       The Ninth Circuit "stay and abeyance" procedure involves actually dismissing
the unexhausted claims and then staying the action containing only the exhausted
claims, leaving petitioner to return to state court, exhaust his claims and then return
to federal court to move to amend his petition to add the claims that he exhausted
in state court. 72 U.S.L.W. at 4524.  Petitioner should not run into any statute of
limitations problems in this type of procedure because the amended petition will
generally relate back to the original. FED. R. CIV. P. 15(c).
       In *Zarvela*, the Second Circuit also implemented a "stay and abeyance"
procedure, however, the Second Circuit does not require the court to dismiss the
unexhausted claims prior to staying the action. The practical effect of both the Ninth
Circuit and the Second Circuit procedures is the same, however, it is unclear
whether after *Pliler*, the court will be able to simply stay the entire action without

conviction in county court to enable that court to consider Johnston's

unexhausted claims.  *Zarvela*, 254 F.3d at 380.

The Court further recommends that if this action is stayed, Johnston

file (in county court) a motion to vacate his sentence pursuant to CPL §

440.10 within ***thirty days*** of the date this report-recommendation is adopted

by the assigned District Judge.[27]  In the event that application is ultimately

denied, Johnston must request that this stay be lifted no later than ***thirty***

***days*** after he has fully exhausted his CPL § 440 motion in the state courts.

Johnston is further advised that his failure to comply with any of the above

deadlines will result in the dismissal of his ***entire petition*** as a mixed

petition and due to his failure to comply with the terms of this court's order.

---

dismissing the exhausted claims first.  Because the Supreme Court was not addressing the propriety of the stay procedure, and only found that the warnings that the Ninth Circuit required when using the procedure were unnecessary, the Court's dicta regarding the procedure itself did not give lower courts significant guidance.  Because this court utilizes the procedure outlined in *Zarvela*, I have not recommended dismissal of the unexhausted claims prior to recommending a stay.  Future cases may give the court guidance on this issue, and if the District Court should find that *Pliler* has altered the procedures in *Zarvela*, the court may simply dismiss the unexhausted claims prior to issuing the order to stay this action until petitioner returns to amend after having exhausted his claims.

[27]     In order to avoid excessive delays on the part of a petitioner in returning to federal court after exhaustion, the *Zarvela* court opined that district courts may properly "allow[] a habeas petitioner no more than reasonable intervals of time to present his claims to the state courts and to return to federal court after exhaustion."  *Id.*, 254 F.3d at 380 (citing *Adams v. United States*, 155 F.3d 582, 584 n. 2 (2d Cir. 1998)).

*See*, *e.g.*, *Castillo v. Hodges*, 2003 WL 359460, at *4 (S.D.N.Y. Feb 18, 2003); *Rowe v. New York*, 99 CIV 12281, 2002 WL 100633, at *6 (S.D.N.Y. Jan. 25, 2002).

**WHEREFORE**, based upon the foregoing, it is hereby

**RECOMMENDED**, that this action be **STAYED** to afford Johnston the opportunity to file a motion to vacate his conviction in the Madison County Court, and it is further

**RECOMMENDED**, that Johnston file that motion to vacate within *thirty days* of the date of the District Judge's Order adopting this Report-Recommendation, and it is further

**RECOMMENDED**, that Johnston request that the stay imposed on his federal habeas petition be lifted no later than *thirty days* after he has fully exhausted his CPL § 440 motion in the state courts, and it is further

**RECOMMENDED**, that if Johnston fails to comply with any of the above deadlines, his petition be dismissed in its entirety for the above stated reasons, and it is further

**ORDERED**, that the Clerk of the court serve a copy of this order upon the parties by regular mail.

**NOTICE**:  pursuant to 28 U.S.C. § 636(b)(1), the parties have **TEN**

**(10) DAYS** within which to file written objections to the foregoing report-recommendation.  Any objections shall be filed with the Clerk of the Court.

**<u>FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL</u>**

**<u>PRECLUDE APPELLATE REVIEW.</u>** *Roldan v. Racette*, 984 F.2d 85, 89

(2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892

F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e) and

72.

Dated:  July 2, 2004

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

27